# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 10-20480-Civ-GRAHAM/TORRES

BURGER KING CORPORATION,

      Plaintiff/Counter-Defendant,

v.

ALVARO M. CABRERA, JACQUELINE
M. CABRERA, JAMES N. GORDON,
E. STANLEY KROENKE, ALBEN THREE
CORPORATION, and DELPA, INC.,

      Defendants/Counter-Plaintiffs.
_____/

# REPORT AND RECOMMENDATION
# ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [D.E. 11] filed on March 9, 2010. The District Judge referred the Motion to the undersigned Magistrate Judge on April 30, 2010. The Court conducted evidentiary hearings on July 28, 2010, August 20, 2010, and September 27, 2010, during which both sides presented testimony and evidence. Based on the motion, the response thereto, the testimony of witnesses (live and by affidavit), the evidence in the record, and oral and written arguments of counsel, Plaintiff's Motion should be denied.

## II.  BACKGROUND

### A.   Parties

Plaintiff Burger King Corporation ("BKC") is a corporation organized under the laws of Florida, with its principal place of business in Miami, Florida.  BKC has developed a restaurant format and operating system and is engaged in the United States and throughout the world in the business of operating over 10,500 Burger King restaurants using the Burger King system and marks.  Over 90% of the Burger King restaurants are licensed to, and operated by, franchisees.

Defendant Alvaro Cabrera[1] ("Cabrera" or "Defendant") owns and operates ten Burger King franchise restaurants through out South Florida.[2]  The relationship between Cabrera and the BKC is governed in accordance with terms and conditions of ten separate but materially identical Burger King Restaurant Franchise Agreements ("Franchise Agreement").

### B.   The Franchise Agreement

The terms of the Franchise Agreement provide that:

Franchisee acknowledges and agrees that prompt adoption of and adherence to BKC's comprehensive restaurant format and operating system, including a standardized design, decor, equipment system, color scheme and style of building and signage, uniform standards, specifications and procedures of operation, quality and uniformity of product, and services offered and the provisions of the Manual of

---

[1]  Although there are multiple named Defendants in this case, as a practical matter Defendant Alvaro Cabrera is the one individual who is ultimately responsible for the management and operation of all ten restaurants subject to this lawsuit.

[2]  The ten Burger King restaurants owned and operated by Defendant bear the following identification numbers: BK #12778, BK #13234, BK #13235, BK #14091, BK #14599, BK #80, BK #4642, BK #9866, BK #10483, and BK #13.

> Operating Data (the "MOD Manual"), as amended from time to time, are reasonable, necessary and essential to the image and success of all Burger King Restaurants.

*See* Burger King Franchise Agreement § 5(A).    More narrowly, with regard to individual equipment, the Franchise Agreement states:

> Only equipment approved by BKC which meets the criteria and performance standards of the Burger King Restaurant System may be used in the Franchised Restaurant.  The equipment shall be maintained in a condition that meets operational standards specified in the MOD Manual and, as equipment becomes obsolete or inoperable, Franchisee will replace the equipment with the types and kinds of equipment as are then approved for use in Burger King Restaurants.
>
> \* \* \*
>
> If BKC determines that additional or replacement equipment is needed because of a change in menu or method of preparation and service or because of health or safety considerations, Franchisee will install the additional equipment or replacement equipment within the reasonable time specified by BKC.

*Id.* § 5(D).

### C.   *New POS Policy*

In April 2008, BKC issued and communicated to Cabrera its 2008 POS ("Point of Sale") Technology Policy ("the 2008 POS Policy").  This new POS Policy mandated all franchisees to replace their existing POS system terminals according to certain timelines based on the "age" of the existing POS system.  Specifically, any POS system that would be 10 years or older as of January 1, 2010 would have to be replaced with a new approved POS system by no later than January 1, 2010.  Furthermore, any POS system that would be 10 years or older anytime after January 1, 2010 but prior to January 1, 2012 would have to be replaced by January 1, 2012.  Finally, the new POS

Policy mandated that all POS systems must be replaced with an approved POS system by no later than January 1, 2014.

### D.    *Termination*

It is undisputed that, as of December 31, 2009, Defendant failed to install the new POS systems outlined in the 2008 POS Policy in any of his ten restaurants. Subsequently, on January 12, 2010, BKC notified Cabrera that his failure to comply with the new POS Policy constituted a default of his obligations under the Franchise Agreements and demanded that he cure the default within the applicable cure period under the Franchise Agreements. These Notices of Default gave Cabrera thirty (30) days to cure the default by coming into compliance with the POS Policy.

Although Cabrera belatedly attempted to get the new POS systems installed in his restaurants within the cure period, he was eventually unsuccessful in doing so. He entered into installation agreements with BKC's vendor, but did not fully fund the installation as BKC demanded. Thus, on February 16, 2010, BKC sent Cabrera letters confirming that his Franchise Agreements had been terminated due to his failure to cure the defaults associated with new POS Policy. Notwithstanding BKC's termination of the Franchise Agreements, however, Defendant has continued to operate his restaurants as authorized Burger King restaurants and to use the BKC Marks. It is true, however, that Cabrera has finally complied with the new POS Policy and installed the new POS systems in all his restaurants by April 2010, roughly two months after the cure date.

As a result, also on February 16, 2010, BKC initiated this lawsuit against Cabrera seeking damages and injunctive relief. The ten-count complaint alleges, *inter alia*, breaches of franchise agreements and claims for infringement and false designations under common law and Lanham Act. On March 9, 2010, the instant motion for preliminary injunction followed.

BKC's Motion for Preliminary Injunction seeks to enjoin Defendant from using, in connection with the advertising, promotion and sale of any food products or services, any Burger King Corporation's trademarks or service marks, and from holding the Restaurants out to the public as genuine and authorized Burger King Restaurants. Plaintiff's motion is premised on trademark infringement Lanham Act claims and its breach of contract claims.

On March 31, 2010, Cabrera filed his Opposition to Plaintiff's Motion. [D.E. 24]. Subsequently, evidentiary hearings were held on three separate dates. The Court heard testimony from Richard Garth Blake, II, BKC's Senior Manager of Restaurant Technology Standards, Heileen Bell, BKC's In-House Senior Attorney, Jason Ashby, BKC's Franchise Business Leader, Defendant Alvaro Cabrera, Honorio Padron, a Burger King Franchiser, and Tiffanie Dock, Cabrera's Director of Operations.

Although BKC initially moved to enjoin Cabrera from operating all ten of his restaurants, it withdrew its motion as to six of the restaurants during the evidentiary hearings. Namely, BKC conceded that at the current stage of the proceedings it is not entirely positive whether the POS equipment at these six restaurants was ten years or older on January 1, 2010. As BKC correctly pointed out during the hearing, if such

was the case, Cabrara would have until January 1, 2012 to comply with the new POS Policy and would not be currently at breach of the new directive. Accordingly, only four of Defendant's restaurants, BK #80, BK #4642, BK #9866, and BK #12778, are still at issue in the pending motion for preliminary injunction because BKC has evidence that the POS equipment in these restaurants were older than ten years.

### III.   ANALYSIS

#### A.   *Standard of Review*

To obtain a preliminary injunction, a Plaintiff must demonstrate the following: "(1) a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002); *see also Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[b]ecause a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion.").  However, "[i]f the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to

injunctive relief." *1-800 Contacts*, 299 F.3d at 1247 (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)).

The goal of a preliminary injunction is to prevent irreparable harm and to "preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). "[T]he most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Id.* at 573; *see also All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) ("Preliminary injunctions are issued when drastic relief is necessary to preserve the *status quo*.").

When an injunction does more than preserve the status quo, however, an even stronger showing is required. *See, e.g., Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction . . . especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party."); *United States v. Board of Educ. of Green County, Miss.*, 332 F.2d 40, 46 (5th Cir. 1965) ("mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds").

### B.   *Trademark Infringement*

BKC's entitlement to injunctive relief depends upon whether it is likely to prevail on the merits of its trademark infringement claim under Lanham Act. Section 32(a) of the Lanham Act provides, in relevant part, that:

> Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a). Therefore, to prevail on a trademark infringement claim, the plaintiff must show that its trademark was used in commerce by the defendant without the registrant's consent, and that the use is likely to deceive, cause confusion, or result in mistake. *See, e.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir. 1983).

It is undisputed here that Plaintiff is the owner of the Burger King name and marks. It is also essentially undisputed that Cabrera's use of the Burger King name and marks, if unauthorized, will confuse the public as to the source, origin, sponsorship, or affiliation of Defendant's goods. *See, e.g., S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (finding that there is a considerable likelihood of confusion when an infringer uses the exact trademark as the plaintiff's). Cabrera, however, argues that he is not using the marks without consent because BKC improperly terminated the Franchise Agreements.

Defendant is correct that the validity of BKC's trademark claims are contingent upon BKC first establishing that its termination of the franchise agreement was legal and proper. In *McDonald's Corp. v. Robertson*, the Eleventh Circuit stated that:

> We find that the Lanham Act's requirement that a franchisor demonstrate that unauthorized trademark use occurred to prevail on the merits of a trademark infringement claim against a franchisee necessitates some type of showing that the franchisor properly

terminated the contract purporting to authorize the trademarks' use, thus
resulting in the unauthorized use of trademarks by [the defendant].

147 F.3d at 1308.  The court also affirmed that the district court "properly required

[the plaintiff] to make a showing that it properly terminated the franchise agreement."

*Id.*, *see also Computer Currents Pub. Corp. v. Jaye Comms., Inc.*, 968 F. Supp. 684, 688

(N.D. Ga. 1997) ("[I]n order to satisfy the first prerequisite for a preliminary injunction

[likelihood of success on the merits], plaintiffs must demonstrate that, under the terms

of the Agreement, they were entitled to terminate the Agreement immediately based

on defendant's conduct.").

With these principles in mind, we turn to the first evidentiary burden that BKC

must satisfy.

### 1.  Likelihood of Success on the Merits

BKC contends that the termination of Defendant's Franchise Agreements was

proper and lawful because Defendant failed to comply with a contractual requirement

to replace the POS systems in his Burger King restaurants with the new POS systems

by January 1, 2010.

The Franchise Agreement specifically addresses the circumstances by which a

franchisee is required to replace or upgrade her current approved equipment: (1) when

it is obsolete or inoperable; (2) due to a change in menu; (3) due to a change in method

of preparation and service of product; or (4) for health and safety considerations.  *See*

Franchise Agreement § 5(D).

BKC argues that the implementation of new POS Policy was justified because

the old POS systems were obsolete and due to a change in method of preparation and

service of product.  BKC also cites to Section 5(A) of the Franchise Agreement and claims that this section mandates all franchisees promptly adhere to BKC's uniform standards, product specifications and operating procedures.

Plaintiff's reliance solely on Section 5(A) for its justification of terminating Cabrera when he failed to comply with the new POS policy may be misplaced.  Section 5(A) is a general recital wherein the franchisee agrees that, from time to time, certain changes to the MOD Manual are reasonable and necessary for the BKC to succeed as a franchise system.  Instead, Section 5(D), entitled "Equipment," specifically describes the circumstances under which BKC may demand its franchisees to replace a given piece of equipment.  Under Florida law, a "specific clause takes precedence over more general ones, and where there are general and specific provisions in a contract relating to the same thing, the special provisions will govern in its construction over matters stated in general terms." *Indulgence Yacht Charters Ltd. v. Ardell Inc.*, No. 08-60739, 2008 WL 4346749, at *5  (S.D. Fla. Sept. 16, 2008) (quotations and citations omitted); *see also Volusia County v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 133 (Fla. 2000).[3]

Taking that into consideration, we  conclude that a substantial factual question exists as to whether the POS systems that were installed at Defendant's restaurants were "obsolete" at the time the POS Policy was issued in April 2008.  BKC contends that the new POS system provides a consistent base of information allowing for better product sales analysis, and more effective product and promotion activities.  BKC also

---

[3]     It is undisputed that the Franchise Agreement is interpreted under Florida law.

the proffered testimony of Richard Blake, BKC's Senior Manager of Restaurant Technology Standards, who claimed that the new POS systems establish a standard infrastructure and database architecture for the Burger King System, allowing BKC to introduce a standardized data set and such set is necessary to the Burger King System to poll product level data from Burger King Restaurants to make intelligent and informed marketing decisions. Defendant, on the other hand, proffered evidence that BKC already has a system-wide service in place, supported by third-party Restaurant Services, Inc. ("RSI"), that harvests data from Burger King restaurants and analyzes it for more effective product and promotion activities and to validate royalties.

Although we agree with Plaintiff it is not this Court's task to question BKC's business judgment whether the data and operational improvements offered by the new POS system is substantially the same or better than the old system, BKC's permissive business decisions must be within the parameters outlined in the Franchise Agreements. Clearly, the new POS system makes is easier for the BKC to monitor royalty payments and to audit sales. However, whether this ability makes the older POS system "obsolete" is a much closer and debatable question that should be resolved on the full record and at trial if necessary. In today's rapid growing world of technology new creative inventions are uncovered on nearly daily basis. Each new invention, although it may be a clear improvement over the older version of the same product, does not necessarily make the older product "obsolete."

On the other hand, that same rapidly changing world bolsters BKC's argument that it must be able to quickly adjust to changes in the marketplace to compete in the very competitive fast good industry, both domestically and internationally. BKC

persuasively points to its new POS system as an important piece of that effort. Enhanced systems allow for faster, more efficient service, consistent with the level of service customers quickly grow to expect once a competitor in the market begins to utilize those systems. BKC thus engaged in a systematic effort to update its POS systems to adjust to this changing environment.

From a policy perspective, this makes much sense, from the franchisor *and* franchisee perspective. From a legal perspective, however, those legitimate business reasons for forcing these changes on BKC's timetable, not the franchisees' preferred timetable, do not automatically render traditional contractual interpretations themselves "obsolete." The Court is faced with the language in question in this version of BKC's franchise agreements. Having heard the evidence, on the limited basis available in an temporary injunctive relief basis, the Court is simply not convinced that BKC has met its burden on this record of showing that a "substantial likelihood" exists that its interpretation of this contract will prevail as a matter of law or before a jury to the extent the Court deems there to be a factual issue in the record. And without making such a finding, the Court is left with no ability to conclude that BKC properly terminated this franchise agreement, thereby entitling it to the full panoply of remedies available under the Lanham Act and the contractual enforcement provisions of the agreement.

It is not surprising, for instance, that BKC has begun revamping and updating the language used in its BKC franchise agreements to make it more abundantly clear that failure to timely make the type of system changes required here renders a

franchisee in default.  The issue we are left to address is whether the existing language in the BKC agreement with this franchisee provides BKC with the right to obtain injunctive relief on this factual showing.  After affording this matter much thought and deliberation over a careful review of the entire record, we are not convinced that we can find that the failure to make these system changes on this timetable renders the equipment obsolete and subject to default and failure to cure provisions of the agreement.[4]

That does not mean, of course, that BKC will not ultimately prevail on this issue, either on summary judgment or at trial.  If the Court or trier of fact determines that BKC's policy to update the POS systems on this timetable rendered the existing equipment obsolete, BKC will then be able to shut down Defendants' operations.  The question here is a more limited one: can we make that determination before a plenary review of the case on a preliminary injunction motion.  We are much less certain of that.  Hence, our recommendation is that the motion be denied on this basis.

BKC then argues that the new POS systems were clearly necessary because of "a change in the method of preparation or service."  It contends that the new standardized POS system changes the method of preparation and service through, among other things, improving the technology and function of the kitchen, as well as improving overall operations at the restaurant and for the Burger King System.

---

[4]    We note as well that BKC's showing of obsolence likely increases over time, given the rapidly changing technology that we are dealing with.  Therefore, whether a similarly situated franchisee down the road may also successfully defend a motion such as this in a different case is very much in doubt.

Plaintiff's argument on this contractual provision is less convincing. Indeed, the new POS system integrates with Kitchen Minder[5] function to allow a given Burger King Restaurant operator to anticipate the type and amount of product that will be needed during certain peak times of the day. This, according to BKC, speeds up the service and makes the product available to the customer faster. Defendant, however, proffered evidence that it had already installed Kitchen Minders in his restaurants and enjoyed their functionality for years. In other words, the implementation of the new POS systems with Kitchen Minders appear to have marginal impact on "the method [of food preparation] and service." As Defendant points out, Kitchen Minder is merely a predictive statistical program that has no impact on the *method* of how the food is prepared.

Finally, there remains a substantial question as to the manufacture dates of the POS systems that were operating at Defendant's restaurants at the time the POS Policy was issued in April 2008. As previously noted, if a POS system was manufactured between January 1, 2000 and December 31, 2002, the new POS Policy required its replacement by January 1, 2012, rather than January 1, 2010. Neither party has proffered direct evidence as to the manufacture dates of the POS systems in the four remaining restaurants at issue. Instead, on one hand, BKC proffered declaration of William T. Doan, the President of SICOM Systems, Inc.,[6] who attests

---

[5]    Kitchen Minder is monitoring system that monitors time and temperature in the cabinets and notifies staff and managers when to prepare more food and discard older products.

[6]    SICOM is the company that installed POS systems at Defendant's restaurants.

that the POS systems at BK #80, BK #4642, BK #9866, and BK #12778 were installed after January 1, 2000. Naturally, installation dates post-dated the manufacture dates. Thus, if credited, Doan's testimony would establish that Defendant's four restaurants were in default of the 2008 POS Policy. Cabrera, on the other hand, submitted leasing agreements and testified that the POS systems at his restaurants were installed between February 2000 and May 2003. This is an important and dispositive determination that, on this record, is not suitable for adjudication by way of a preliminary injunction.

Although we do not rely on this additional point, we add that there is a substantial question here whether Defendant satisfied the opportunity to cure its default prior to the termination of the relevant franchises. The evidence in the record shows that contracts with the vendor had been entered into prior to the expiration of the cure period. BKC's inhouse counsel was not satisfied with that because she determined that only a fully funded vendor agreement would represent proof that Defendant was complying with their cure obligations under the agreement. On its face that seems reasonable. But it is equally plausible that a trier of fact, if asked that question at trial and if the defense survives summary judgment, will find that the contract cure provisions were satisfied by the Defendant's undertakings prior to the expiration of that time period. After all, it is not disputed that had the vendor contracts been fully funded by the expiration date, the POS systems may still have taking several weeks or months to be installed. And that is ultimately what occurred; within two months the compliant POS systems were installed at the Defendant's

restaurants.  Thus, Defendant makes a plausible argument that it will succeed on its defense to the claim of breach.

We again do not rely for the most part on this latter issue because BKC's position is ultimately much stronger.  But because BKC's initial liability showing has not convinced us to the degree required for us to find a "substantial likelihood of success" on that predicate issue, we rest our recommendation primarily on that ground.  Accordingly, the Court finds that Plaintiff has not made a substantial showing of likelihood of success on merits on its trademark infringement claim to warrant the entry of a preliminary injunction order before final disposition of BKC's claims.

### 2.   *Irreparable Harm*

Irreparable harm is the "'*sine qua non* of injunction relief.'" *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Without a finding of a likelihood of an "actual and imminent" irreparable injury, preliminary injunctive relief is improper.  *Id.*  To satisfy this requirement a movant must show a significant threat of irreparable harm, and not merely rely on remote or speculative injuries.  *See, e.g., Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992) (injunction is inappropriate if possibility of future harm arising from the behavior plaintiff seeks to enjoin is purely speculative); *Northeastern Fla. Chapter*, 896 F.2d at 1286 (conclusory allegation of irreparable harm in verified complaint and assertion of speculative economic injury at injunction hearing were inadequate to support an injunction order).

Until recently, the law in this Circuit applied a presumption of irreparable harm once a plaintiff established a likelihood of success on the merits of a trademark infringement claim. *North American Medical Corp. v. Axiom Worldwide, Inc.*, 522, F.3d 1211, 1227 (11th Cir. 2008). This presumption, however, is now questionable after the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

In *eBay*, MercExchange sought to license its business method patent to eBay, but no agreement was reached. *Id.* at 390. MercExchange then sued eBay for patent infringement. *Id.* The jury found that eBay had infringed the patent, and that damages were appropriate. *Id.* at 390-91. The trial court denied MercExchange's motion for permanent injunctive relief. *Id.* at 391. The Federal Circuit reversed the District Court applying its "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." *Id.*

The Supreme Court granted certiorari and reversed. The Supreme Court looked instead to "well-established principles of equity" and held that even in a patent case, a party seeking a permanent injunctive relief must satisfy each prong of the four-factor test before a court may grant an injunction. *Id.*

While the complete contours of *eBay* have yet to be developed, the Supreme Court has clearly expressed its disapproval for the use of categorical rules in connection with injunctive relief in intellectual property actions. Although the *eBay* decision addressed permanent injunctive relief under the Patent Act, a recent Eleventh Circuit opinion appears to have extended its holding to trademark infringement actions

under the Lanham Act. *See Axiom*, 522 F.3d at 1227-28 ("Because the language of the Lanham Act - granting federal courts the power to grant injunctions 'according to the principles of equity and upon such terms as the court may deem reasonable' - is so similar to the language of the Patent Act, we conclude that the Supreme Court's *eBay* case is applicable to the instant case.").

The panel's opinion in *Axiom*, however, acknowledged that under certain conditions a presumption of harm may be presumed in certain trademark infringement cases. *Id*. at 1228 ("[W]e decline to decide whether the district court was correct in its holding that the nature of the trademark infringement gives rise to a presumption of irreparable injury. In other words, we decline to address whether such a presumption is the equivalent of the categorical rules rejected by the Court in *eBay*."). *Cf*. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:47 (4th ed. 2009) ("the presumption of irreparable injury traditionally followed in trademark preliminary injunction cases is in [no] way inconsistent with the letter or the spirit of the Supreme Court's *eBay* decision").

There is a split among the district courts on the issue of whether presumption of irreparable harm is still applicable in trademark cases after *eBay*. *Compare Operation Able of Greater Boston, Inc., v. National Able Network, Inc.*, 646 F. Supp. 2d 166, 176-77 (D. Mass. 2009) (applying presumption of irreparable harm once the court found a substantial likelihood of success on a trademark infringement claim), *with Skydive Ariz., Inc. v. Quattrocchi*, No. CV-05-2656-PHX-MHM, 2010 WL 1743189, at *1 (D. Ariz. Apr. 29, 2010) (declining to apply the presumption of irreparable harm in

a trademark case in light of the *eBay* decision).  However, we have no need to decide whether a court may still presume irreparable injury upon finding a likelihood of confusion in a trademark case, a difficult question indeed.  Obviously, Plaintiff cannot obtain the benefit of the presumption in the instant case, where the Court finds no substantial likelihood that Plaintiff will prevail on the merits of its Lanham Act claim.[7]

Accordingly, the Court finds that Plaintiff's failure to establish likelihood of prevailing on the merits of its claims necessarily negates finding that it will suffer irreparable injury if the injunction is not granted.[8]

### 3. *Balance of Hardships and Public Policy*

Plaintiff argues that threatened harm to BKC outweighs any harm to Defendant because any harm suffered by the Defendant was self-inflicted and brought about by

---

[7]     We note that if Plaintiff was successful in establishing the likelihood of prevailing on the merits of its claims, BKC would most likely be able to establish irreparable harm without that evidentiary presumption.  *See, e.g., DS Waters of America, Inc. v. Princess Abita Water, L.L.C.*, 539 F. Supp. 2d 853, 863 (E.D. La. 2008) ("In trademark and trade dress cases specifically, if one trademark user cannot control the quality of the other trademark users's goods and services, he can suffer irreparable harm.  This type of irreparable harm can be measured by the loss of goodwill and damage to reputation, both of which can be traced to loss of control over the alleged trademark infringer's products.  This loss of control constitutes immediate irreparable harm.")

[8]     We point out, however, that this case does not involve health and safety issues, which undoubtedly increase the potential for irreparable harm if a delinquent franchisee is not barred from continuing operations.  In such a case, a lesser showing of substantial likelihood of success may be forgiven given the severe prejudice that BKC would suffer if an injunction were not entered, together with the public policy interests involved in such a circumstance.  Here, however, there is no argument that Defendant has jeopardized BKC's well-earned reputation for cleanliness and safety.  The old or new POS systems are not alleged to reach to that level of importance from a public safety perspective.  Therefore, our conclusion that this particular injunction motion be denied for now does *not* mean that a similar situation that does present public safety issues may not require a different outcome.

their own actions and was far outweighed by the immeasurable damage done by the infringement of the BKC Marks. *See, e.g., Burger King Corp. v. Majeed*, 805 F. Supp. 994 (S.D. Fla. 1992). BKC also argues that public policy considerations dictate that it is entitled to injunctive relief in light of the fact that Defendant has been using the BKC Marks without authority. Although Plaintiff's arguments would usually have a significant merit, they are not compelling here because BKC has failed to establish substantial likelihood of success of its claims on the merits.

Other than the alleged breach of the Franchise Agreement related to the untimely compliance with the new POS policy that has already been cured, it appears that Defendant's restaurants continue to operate properly with no harm whatsoever to the goodwill of the Burger King brand. Thus, the *status quo* between the parties is essentially preserved. On the other hand, an injunction would essentially put Defendant out of business and cause hundreds of people to lose their jobs. Thus, in light of the fact that this case is a very close call on the merits, balance of hardships and public policy weigh against injunctive relief.

## IV. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Plaintiff's Motion for Preliminary Injunction [D.E. 12] be **DENIED**.

The parties shall have five (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Donald L. Graham, United States District Judge. Given the nature of the remedy sought, the Court will expedite the period for filing objections as per S.D.

Fla. Local Mag. J. R. 4(b).  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of any issue included in the Report and shall bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1); S.D. Fla. Local Mag. J. R. 4(b).

**DONE AND ORDERED** in Chambers, Miami, Florida this 29th day of December, 2010.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge